[No. S043162. Dec. 16, 1996.]

In re the Marriage of DONNA JEAN and GERALD LEE COMER.
DONNA JEAN COMER, Appellant, v.
GERALD LEE COMER, Respondent.

**COUNSEL**

Daniel E. Lungren, Attorney General, Roderick E. Walston, Chief Assistant Attorney General, Carol Ann White and Mary A. Roth, Deputy Attorneys General, for Appellant.

Laurie Michelena Erickson and Sue Ellen Castrellon for Respondent.

**OPINION**

**GEORGE, C. J.**—In *In re Marriage of Damico* (1994) 7 Cal.4th 673, 676 [29 Cal.Rptr.2d 787, 872 P.2d 787] (*Damico*), we held that a custodial parent's concealment of his or her own whereabouts and that of the parent's child until the child reached the age of majority may estop that parent from seeking payment of child support arrearages that accumulated during the period of concealment. We expressed no opinion in *Damico* as to whether a

similar rule of estoppel would apply "when the concealment ends while the child is still a minor and might yet benefit from payment of the arrearages." (*Id.* at p. 685.) Also, because *Damico* did not involve public assistance payments or the assignment of child support rights to a governmental entity, we expressed no opinion as to whether concealment by the custodial parent would estop a governmental entity, as assignee of the custodial parent's right to receive child support payments, from obtaining reimbursement for public assistance payments made to the custodial parent. (*Ibid.*)

In the present case, which involves concealment by a custodial parent that ended while her children still were minors, as well as the payment of public assistance in the form of Aid to Families with Dependent Children (AFDC), the Court of Appeal held that such concealment estopped the mother from collecting child support arrearages from the father, and that Gila County, Arizona, as assignee of the mother's rights, similarly was estopped from obtaining reimbursement from the father for AFDC payments made by the county to her.

This case thus presents the issues, noted above, that we explicitly declined to reach in *Damico*. As we shall explain, we conclude that a custodial parent's concealment of both parent and child—a concealment that terminates when the child still is a minor—does not constitute a defense to an action brought on behalf of the child against the noncustodial parent for child support arrearages. We further conclude that where the custodial parent has obtained public assistance payments for the child, and has assigned the right to child support arrearages to the public entity providing such assistance, the conduct of the custodial parent in concealing the child from the other parent does not estop the public entity from seeking child support arrearages—or reimbursement for public assistance payments—from the noncustodial parent.

Accordingly, we reverse the judgment of the Court of Appeal and order the case remanded for the purpose of determining the amount of child support arrearages due and reimbursement owed for AFDC payments made.

## I.

Donna Jean Comer (mother) and Gerald Lee Comer (father) were married in 1980. Later that year, mother gave birth to the couple's first child, a son, and a second son was born in 1983. The family lived in the State of Florida until approximately 1985, when financial difficulties caused them to consider relocating to the State of Arizona (where mother's family resided).

Mother and the children moved to Arizona while father remained in Florida to complete some business. He planned to join his family in Arizona but instead was served with notice that mother had obtained the dissolution of their marriage by default judgment in March 1985 in Gila County, Arizona.[1]

The default judgment awarded custody of the children to mother, subject to "reasonable visitation" by father, which the decree of dissolution of marriage defined as "[a]ny time [father] can get out here [to Arizona] or can afford to bring them out there. No more than 2 weeks at any one time." The judgment also ordered father to pay monthly child support of $350 for each child, for a total of $700 per month. Mother did not provide father with her new address, and instructed her family not to disclose her whereabouts to him.

Although father was served with copies of the orders granting dissolution and child support, he failed to make any monthly child support payments during the period between the dissolution of his marriage in March 1985, and September 1992, when he paid $100. In October 1992, he paid $300. At some point during this seven-and-one-half-year period, mother applied for, and began receiving, AFDC payments. As a condition of providing this public assistance to mother, Gila County, Arizona, pursuant to federal statutory mandate, required mother to assign to the county her rights to all current and past due support. (See 42 U.S.C. § 602(a)(26)(A).)

Father made no payment in November 1992. Later that month, mother commenced these proceedings in Gila County, seeking current child support and arrearages. Because father had moved to Orange County, California, Gila County (acting on mother's behalf) transmitted its petition—seeking enforcement of the existing child support order against father, collection of $29,300 in accrued child support arrearages, and recoupment of $35,096 in AFDC benefits—to the Orange County Superior Court, pursuant to the Revised Uniform Reciprocal Enforcement of Support Act (RURESA), now known as the Uniform Reciprocal Enforcement of Support Act (URESA). (See Fam. Code, § 4800 et seq.; prior to 1994, these provisions were found at Code Civ. Proc., former § 1650 et seq.)[2] The State of California, acting as the "responding state" (Fam. Code, § 4802, subd. (i)), and represented by the

---

[1]The record does not disclose whether father received prior notice of the proceedings. Father has not challenged the validity of the dissolution (including the order for child support) on the ground of lack of notice.

[2]The renaming of the statutory scheme, effective January 1, 1994, was to achieve "consistency with the usage of the National Conference of Commissioners on Uniform State Laws. (Fam. Code, § 4800, and the Law Revision Comments thereto.)" (*Damico, supra,* 7 Cal.4th at

Orange County District Attorney's Office Family Support Division (Fam. Code, § 4831), filed the petition pursuant to Welfare and Institutions Code sections 11350, 11350.1, and 11475.1, to obtain the relief requested.[3]

Father filed an answer that denied all allegations set forth in the complaint and raised numerous affirmative defenses, including mother's "deliberate[] conceal[ment of] her whereabouts and the whereabouts of the minor children," fraud, estoppel, waiver, laches, and the statute of limitations. Father also submitted a declaration that set forth the details of his financial difficulties and his unpleasant relationship with mother.

The case was heard in August 1993. At the hearing, father elaborated upon the topics addressed in his declaration. He testified that, at the time of the marital dissolution, he did not submit any information to the court regarding his income, did not attend the dissolution proceedings, and had no idea upon what basis the court had ordered monthly child support in the amount of $700.

Father further testified that, during the initial period of separation in 1985, he communicated by telephone with his children when they visited the Arizona residence of their maternal grandparents. Although he was unaware of the precise location of mother's residence from 1985 to 1992, he was in telephone contact with her. Whether the estranged couple discussed father's child support obligations during these conversations is not disclosed by the record. In 1986 or 1987, father moved from Florida to California, stopping in Arizona to visit the children but, according to father, mother prevented the reunion. Father remained in touch with mother's parents and knew that the children frequently stayed with them. He knew that mother's parents and sisters lived in Phoenix, Arizona.

In 1988, father arranged through mother's parents to travel from California to Arizona in order to spend a weekend with the children at the grandparents' residence. Mother and the children, however, failed to appear at the residence at any time during the scheduled weekend. Father believed that mother had warned her parents that if they ever informed father as to the

---

p. 678, fn. 2.) To avoid confusion, we shall refer to the appropriate statutory designations under the URESA scheme.

[3]Welfare and Institutions Code sections 11350, 11350.1, and 11475.1, inter alia, authorize the local district attorney to prosecute actions for child support in the name of the county on behalf of the child or children of the custodial parent, and to recover arrearages in support payments. (See *Crider* v. *Superior Court* (1993) 15 Cal.App.4th 227, 230, & fn. 3 [18 Cal.Rptr.2d 757].)

whereabouts of her or her children, she never again would permit her parents to see their grandchildren.

Father testified that he subsequently learned mother had remarried, but that he did not know her new married name. He did not contact law enforcement officials in an effort to locate her, because he did not believe they would help, and he stated he could not afford to retain the services of a private investigator. He did not consider using the Arizona court system to enforce his right of visitation with his children. Although he occasionally communicated with mother's parents, he did not again speak directly with his children until September 1992, when his older son telephoned him. At that point, father learned of mother's new name and the address where she and their children resided.

Father also described his persistent financial problems that stemmed from his difficulty in obtaining work as a flooring installer. He testified that, after remarrying, he and his new wife reported a gross income for the year 1992 in the amount of $53,628, of which approximately $20,000 was attributable to his wages. He added that, as of September 1992, he no longer possessed a contractor's license, a circumstance that compelled him to perform less lucrative work as a handyman. He estimated that his gross monthly wages as of August 1993 were approximately $1,500, from which, by virtue of his self-employment status, he was responsible for business expenses of approximately $500.

Upon hearing father's testimony, the court ordered him to pay a total of $371 in monthly child support for both children. With regard to the 11-month period that extended from mid-September 1992 to August 1993, when father was in contact with mother and their children, the court found that father owed support arrearages in the amount of $7,700, against which the court applied an offset of $2,748, for money paid by father to Gila County and for funds intercepted from his income tax refund, leaving a balance of arrears in the amount of $4,952. The court ordered that these arrearages be paid down at the rate of $50 per month. Rejecting an argument made by the prosecutor that father owed $64,396 for welfare reimbursement and support arrearages dating back to 1985, the court found that no support arrearages were due from March 1985 to September 1992, because during that period mother actively concealed her whereabouts and those of her children. The court reasoned that if father did not know mother's address, he was prevented from sending her child support and could not effect personal service upon her—a circumstance that prevented him from obtaining either a modification of the support order or sanctions against mother.

On behalf of mother and Gila County, Orange County appealed from the court's decision, contending that the defense of child concealment was neither established nor available. The Court of Appeal affirmed the judgment of the trial court, agreeing with the lower court that father had established mother's concealment and holding that such concealment estopped Gila County, as mother's assignee, from collecting child support arrearages and from seeking AFDC reimbursement. Thereafter, we granted the petition for review filed by the Attorney General on behalf of Orange County and mother.

## II.

### A.

In *Damico, supra,* 7 Cal.4th 673, we addressed the question whether a custodial parent's concealment of herself and her child until the child reached the age of majority gave rise to a defense to an action by the custodial parent for child support arrearages. The case involved a couple who were married and became parents in 1958 and who dissolved their marriage in 1960. The judgment of marital dissolution ordered the father to pay child support, which he did for a short period of time. The father then stopped paying under circumstances disputed by the parties. In 1979, after the child had become an adult, the mother sued the father for child support arrearages. A default judgment was entered against him in San Francisco Superior Court the following year, determining that the father owed over $12,000 in child support arrearages and more than $10,000 in interest. In 1991, the Marin County District Attorney, acting on the mother's behalf, filed a statement for registration of foreign support order, which the father moved to vacate. At a hearing to consider the question of arrearages, the father offered to prove that, during the period 1960-1979, the mother had concealed herself and the child from him. The trial court refused to consider the father's "concealment defense," declined to set an evidentiary hearing, and ordered him to pay the entire amount of arrearages plus interest. The Court of Appeal thereafter reversed the judgment of the trial court. (7 Cal.4th 673, 676-677.)

In affirming the judgment of the Court of Appeal in *Damico,* we held that a parent who has concealed a child until the minor reached adulthood may be estopped from seeking child support arrearages: "The custodial parent should not be allowed to make the payments impossible, then seek arrearages after the purpose of the judgment, payment of support

for the benefit of the *child,* has been defeated. [¶] . . . [¶] We thus conclude that a custodial parent who actively conceals him- or herself and the child from the noncustodial parent until the child reaches the age of majority, despite reasonably diligent efforts by the noncustodial parent to locate them, is estopped from later collecting child support arrearages for the time of the concealment. . . . [¶] This case involves alleged concealment until the child reached the age of majority. Therefore, we cannot, and do not, express an opinion on the rule when the concealment ends while the child is still a minor and might yet benefit from payment of the arrearages. Because estoppel is an equitable defense, the equities might be different if the concealment were for a shorter time, especially if the innocent child particularly needed the arrearages. This case also does not involve public assistance payments or the assignment of child support rights to a county or other governmental entity, and we therefore do not decide any questions related to those circumstances. [Citations.]" (*Damico, supra,* 7 Cal.4th at pp. 684-685, original italics.)[4]

## B.

As noted above, the child in *Damico* already had reached the age of majority when the mother instituted her action to obtain child support arrearages. The concealment in the present case ended in September 1992, when the couple's older child, then age 12 years, contacted his father. That child is now 16 years of age, and his brother is 13 years of age. Accordingly, we turn to the first issue that we left unaddressed in *Damico*—and that is presented here—namely, whether the mother's concealment of herself and her children provides a basis for an estoppel defense to a claim for child

---

[4]In *Damico*, we observed that the Courts of Appeal had reached conflicting conclusions as to whether, based upon a custodial parent's concealment, a noncustodial parent has a valid defense of estoppel to a claim for child support arrearages. (7 Cal.4th at pp. 679-682; cf. *In re Marriage of McLucas* (1989) 210 Cal.App.3d 83 [258 Cal.Rptr. 133], *In re Marriage of Smith* (1989) 209 Cal.App.3d 196 [257 Cal.Rptr. 47], *Solberg* v. *Wenker* (1985) 163 Cal.App.3d 475 [209 Cal.Rptr. 545], *In re Marriage of Daves* (1982) 136 Cal.App.3d 7 [185 Cal.Rptr. 770], *Szamocki* v. *Szamocki* (1975) 47 Cal.App.3d 812 [121 Cal.Rptr. 231], and *Kaminski* v. *Kaminski* (1970) 8 Cal.App.3d 563 [87 Cal.Rptr. 453], [cases holding that concealment of the child may create an estoppel to collect child support arrearages], with *In re Marriage of King* (1993) 16 Cal.App.4th 1250 [20 Cal.Rptr.2d 486], *Puig* v. *Ryberg* (1991) 230 Cal.App.3d 141 [283 Cal.Rptr. 604], *In re Marriage of Tibbett* (1990) 218 Cal.App.3d 1249 [267 Cal.Rptr. 642], *In re Marriage of Kelley* (1986) 186 Cal.App.3d 613 [231 Cal.Rptr. 6], *Camacho* v. *Camacho* (1985) 173 Cal.App.3d 214 [218 Cal.Rptr. 810], *In re Marriage of Ryall* (1984) 154 Cal.App.3d 743 [201 Cal.Rptr. 504], *Carr* v. *Marshman* (1983) 147 Cal.App.3d 1117 [195 Cal.Rptr. 603], *In re Marriage of Anderson* (1981) 125 Cal.App.3d 553 [178 Cal.Rptr. 117], and *In re Marriage of Ciganovich* (1976) 61 Cal.App.3d 289 [132 Cal.Rptr. 261], cases holding that enforcement of a child support obligation cannot be affected by concealment.)

Neither party has asked this court to reconsider our holding in *Damico*, and thus we have no occasion to do so in the present case.

support arrearages, when the concealment has ended before the children have reached the age of majority.

Family Code section 3556 prescribes: "The existence or enforcement of a duty of support owed by a noncustodial parent for the support of a minor child is not affected by a failure or refusal by the custodial parent to implement any rights as to custody or visitation granted by a court to the noncustodial parent." (See also Fam. Code, § 4845, subd. (b) ["The determination or enforcement of a duty of support owed to one obligee is unaffected by any interference by another obligee with rights of custody or visitation granted by a court."].)

■ We held in *Moffat v. Moffat* (1980) 27 Cal.3d 645 [165 Cal.Rptr. 877, 612 P.2d 967] that, notwithstanding the arguable unfairness from the noncustodial parent's perspective of requiring a noncustodial parent to continue making child support payments where the custodial parent has interfered with court-ordered custody or visitation rights, "in such circumstances the child's need for sustenance must be the paramount consideration." (*Id.* at p. 651.) We therefore concluded that deprivation of the noncustodial parent's right to visit his or her child did not diminish that parent's obligation to provide child support. (*Ibid.*)

■ In *Damico, supra,* 7 Cal.4th 673, we held that the rule announced in *Moffat, supra,* 27 Cal.3d 645 did not apply when the custodial parent concealed parent and child until the child reached the age of majority. Under the circumstances presented in *Damico,* the mother was "seeking payment of the arrearages to *herself,* not to the child." (*Damico, supra,* 7 Cal.4th at p. 685, original italics.) Observing that "[t]he harm mother did to the child by denying [his] father's companionship and financial support should not now entitle her to arrearages, many years later, that can no longer benefit the child[,]" we concluded that the mother was estopped from seeking child support arrearages. (*Ibid.*)

■ In the present case, in contrast to the facts presented in *Damico,* the concealment terminated when the children still were minors and might benefit from father's payment of child support arrearages. This distinction is a significant one, because, in contrast to most adults, children (particularly those in their early years) in fairness cannot be expected to raise themselves and pursue an education without the financial support of responsible adults. As we observed in *Moffat, supra,* "the child's need for sustenance must be the paramount consideration." (27 Cal.3d 645, 651; see also *In re Marriage of Lippel* (1990) 51 Cal.3d 1160, 1172, fn. 4 [276 Cal.Rptr. 290, 801 P.2d 1041, 5 A.L.R.5th 1156] [" 'The single most important consideration in an

action for support is the need of the child.'"]; *Evans* v. *Evans* (1960) 185 Cal.App.2d 566, 572 [8 Cal.Rptr. 412] ["In any proceedings involving custody and support it is axiomatic that the 'court should always adopt the course that is for the best interests of the child.'"].) Accordingly, those considerations that we characterized as "the equities" in *Damico* are distinguishable from those found in the present case. (7 Cal.4th at p. 685.)

Our holding in *Moffat, supra,* 27 Cal.3d 645, that denial of rights to custody and visitation does not affect a parent's obligation to provide child support, is controlling in the present case. It is well settled that a child support obligation ". . . runs to the child and not the parent. [Citation.]" (*In re Marriage of McCann* (1994) 27 Cal.App.4th 102, 108 [32 Cal.Rptr.2d 639]; see also *In re Marriage of Ayo* (1987) 190 Cal.App.3d 442, 449 [235 Cal.Rptr. 458] ["It is clear that the law imposes upon parents the obligation of supporting their children and the children's right to such support cannot be limited or abrogated by their parents."]; *Williams* v. *Williams* (1970) 8 Cal.App.3d 636, 640 [87 Cal.Rptr. 754] ["In essence, the parent, to whom such support is paid, is but a mere conduit for the disbursement of that support."].) In *Damico,* we noted our agreement "in the abstract" with the principle "that the actions of one parent should not diminish the *child's* right to support." (7 Cal.4th at p. 685, original italics.) Reaffirming our adherence to this principle, we hold that a custodial parent's concealment of himself or herself and the child, which concealment ends when the child still is a minor, does not establish a defense to an action, brought on behalf of the child, for child support arrearages.[5]

The Attorney General contends that if the children were being supported by public assistance payments for any substantial period of time, it is certain their needs were being met at only a minimal level. Certain educational expenses, cultural opportunities, and access to various goods and services undoubtedly were not available to the children and, because of the apparently lengthy period of dependence upon public assistance payments, there exists a likelihood that there has been an accumulation of unmet needs.

In response, father reiterates that, had he known where to send child support payments during the years 1985-1992, he could have provided funds for the myriad of activities that could be considered to fall within the normal

---

[5]We observe that the present case also differs from *Damico* in another respect: unlike *Damico,* the present action to recover the child support arrearages involves a governmental entity (Gila County, Arizona), to which mother had assigned all rights to child support upon receiving public assistance for the children. As we explain in part C., *post,* the reasoning upon which we relied in *Damico* to hold that the mother was estopped from seeking child support arrearages for her own benefit does not apply in an action involving a governmental entity, as assignee, to recover public assistance payments provided for the benefit of the child.

range of benefits for middle-class children. Because, due to mother's concealment of herself and her children, father was unaware of the address at which they resided, he contends he should not now be required to pay child support arrearages for the period during which he did not know the whereabouts of his children.

We reject father's position. We are unpersuaded that requiring father to pay his child support arrearages would be unjust in the present case. As the noncustodial parent who has not fulfilled his child support obligations, father "has had the use of the money in the past, but his child[ren]'s needs are in the present and surely exceed the amount of the current order for support." (*County of Orange* v. *Dabbs* (1994) 29 Cal.App.4th 999, 1005 [35 Cal.Rptr.2d 79].)

Father's contention that an order requiring him to reduce his substantial arrearages will prevent him from making current support payments fails to recognize the statutory scheme that establishes the priority of the noncustodial parent's current support obligations. Payments that exceed the court order for current support obligations are to be applied first to interest and then to any arrearages owed. (See Code Civ. Proc., § 695.221.)[6]

On October 20, 1994 (after the trial court's judgment was affirmed by the Court of Appeal in the present case, but before mother filed her petition for review), President Clinton signed into law the Full Faith and Credit for Child Support Orders Act, 28 United States Code section 1738B (section 1738B or FFCCSOA), which requires that state courts give "full faith and credit" to child support orders issued by sister states. FFCCSOA requires that "[t]he appropriate authorities of each State . . . [¶] (1) shall enforce according to its terms a child support order made consistently with this section by a court of another State; and [¶] (2) shall not seek or make a modification of such an order except" under certain limited circumstances that are not found in the present case. (§ 1738B(a) & (e).)[7] "Child support" is defined to encompass "continuing support, or arrearages," and "a child support

---

[6]Code of Civil Procedure section 695.221 provides: "Satisfaction of a money judgment for support shall be credited as follows: [¶] (a) The money shall first be credited against the current month's support. [¶] (b) Any remaining money is next to be credited against the accrued interest that remains unsatisfied. [¶] (c) Any remaining money shall be credited against the principal amount of the judgment remaining unsatisfied. . . ." See also 42 United States Code section 657(b); 45 Code of Federal Regulations section 302.51 (1996).

[7]Pursuant to FFCCSOA, the limited circumstances under which a court of one state lawfully may modify a child support order issued by a court of another state occur when:

"(1) the court has jurisdiction to make such a child support order; and

"(2)(A) the court of the other State no longer has continuing, exclusive jurisdiction of the child support order because that State no longer is the child's State or the residence of any contestant; or

order" includes "a judgment, decree, or order of a court requiring the payment of child support," whether it is "a permanent or temporary order." (§ 1738B(b); see generally, *In re Marriage of Lurie* (1995) 33 Cal.App.4th 658, 673-676 [39 Cal.Rptr.2d 835]; see also *Day* v. *Child Support Enforcement Div.* (1995) 272 Mont. 170 [900 P.2d 296, 300]; *Bednarsh* v. *Bednarsh* (Ch.Div. 1995) 282 N.J.Super. 482 [660 A.2d 575]; *Isabel M.* v. *Thomas M.* (1995) 164 Misc.2d 420 [624 N.Y.S.2d 356]; *Paton* v. *Brill* (1995) 104 Ohio App.3d 826 [663 N.E.2d 421, 424-425].)

Because neither party cited FFCCSOA in the initial briefing submitted to this court, we requested, and the parties provided, additional briefing regarding the potential applicability to the present case of this recently enacted legislation. Having considered the supplemental briefing, we conclude, for the reasons that follow, that it is unnecessary for us to reach the parties' contentions regarding the applicability of FFCCSOA.

Mother contends that FFCCSOA prohibits father from raising the defense that, because she allegedly concealed herself and their children from him, she is estopped from seeking child support arrearages. Because we conclude, as discussed above, that mother is not estopped from seeking payment of child support arrearages under the circumstances of the present case, we need not, and do not, decide whether FFCCSOA precludes father from raising this defense.

Father contends that, pursuant to the choice of law provisions of FFCCSOA (§ 1738B(g)), the present case is to be decided pursuant to California law, and asserts that under California law mother's concealment of herself and their children constitutes a "complete defense" to the present action for child support arrearages. As discussed above, however, we have rejected father's premise that the defense of estoppel applies in the circumstances of the present case. Accordingly, we need not, and do not, reach father's contentions regarding the proper interpretation of FFCCSOA.[8]

Upon remand, the trial court is directed to order the payment of child support arrearages, crediting the child support payments made by father against the amount of arrearages owed.

---

"(B) each contestant has filed written consent to that court's making the modification and assuming continuing, exclusive jurisdiction over the order." (§ 1738B(e).)

[8]The trial court also reduced father's obligation to pay future child support from $700 to $371 per month. That aspect of the trial court's order was not challenged in the Court of Appeal, but was raised for the first time in the parties' supplemental briefing in this court. Because the issue was not raised in the court below nor set forth in the petition for review, we need not, and decline to, address the issue for the first time in this court. (Cal. Rules of Court, rules 28(e)(2), 29(b)(1).)

## C.

█ We turn to the remaining issue that we explicitly left unaddressed in *Damico* and that is presented here, namely whether the county or other governmental entity, as assignee of the custodial parent's right to receive court-ordered child support arrearages, may be estopped from collecting such arrearages based upon the custodial parent's concealment of himself or herself and the child.

As noted, this URESA proceeding to collect child support arrearages was brought by Orange County on mother's behalf. █ URESA "provides for a reciprocal proceeding commenced in the 'initiating state' where the 'obligee'—usually the mother or child—lives, and tried and enforced in the 'responding state' where the 'obligor'—usually the father—lives or has property." (*Moffat* v. *Moffat, supra,* 27 Cal.3d 645, 650, fn. 3.) Pursuant to URESA, "If a state or a political subdivision furnishes support to an individual obligee, it has the same right to initiate an action . . . as the individual obligee for the purpose of securing reimbursement for support furnished and of obtaining continuing support." (Fam. Code, § 4821.) "All duties of support, including the duty to pay arrearages, are enforceable by an action under this chapter. . . ." (Fam. Code, § 4822.)[9]

█ The trial court found that father owed only $7,700 in child support arrearages, representing the 11-month period between the date he learned of mother's whereabouts in September 1992, and the date of the court hearing on the People's URESA petition in August 1993—less payments made (and a tax refund intercept) in the amount of $2,748, for a remaining balance in the amount of $4,952. The trial court found that father was not obligated to pay any arrearages that accrued prior to his discovery of mother's location in September 1992, because of mother's concealment of herself and her children.

The Attorney General contends Gila County, Arizona, is owed $35,096 in AFDC reimbursement for public assistance paid to mother, in addition to $29,300 in child support arrearages that father owed for the period between the couple's marital dissolution in 1985 and the commencement of AFDC

---

[9] "42 United States Code section 602(a)(26)(A), found within the subchapter dealing with AFDC grants to the states, requires a state plan for aid and services to needy families with children must provide that as a condition of eligibility for aid, the welfare applicant or recipient shall assign to the state any rights to support which have accrued at the time such assignment is executed." (*In re Marriage of Mena* (1989) 212 Cal.App.3d 12, 17-18 [260 Cal.Rptr. 314].) In California, this federal mandate is set forth in Welfare and Institutions Code section 11477. (*In re Marriage of Shore* (1977) 71 Cal.App.3d 290, 295 [139 Cal.Rptr. 349].)

payments to mother—the latter sum to be disbursed to mother, for the benefit of her children. In response, father contends that whatever claim the Attorney General has to reimbursement or arrearages for child support payments owed up to September 1992 is invalid because mother, as the "concealing" assignor, by reason of that concealment had waived her right to receive the payments owed by father and therefore lacked an enforceable right to assign them to the "innocent" assignee (Gila County, Arizona).

We reject father's position. A county's right to reimbursement for public assistance it has paid is well established, and, in fact, predates the 1975 enactment of federal and state regulations that placed the responsibility for enforcement of family support obligations upon the county's district attorney. Family Code section 4002 (which, effective January 1, 1994, replaced, without substantial change, former Civil Code section 248, enacted in 1955) provides: "(a) The county may proceed *on behalf of a child* to enforce the *child's right of support* against a parent. [¶] (b) If the county furnishes support to a child, *the county has the same right as the child* to secure reimbursement and obtain continuing support. The right of the county to reimbursement is subject to any limitation otherwise imposed by the law of this state." (Italics added; see also Welf. & Inst. Code, §§ 11350, 11477, 11487; *City and County of San Francisco* v. *Thompson* (1985) 172 Cal.App.3d 652, 657 [218 Cal.Rptr. 445] [observing that California's "responsible relative statutes," which include Welfare and Institutions Code section 11350 and require responsible relatives to reimburse the state for support payments, constitute "modern descendants of the 17th century Elizabeth Poor Law which imposed support obligations for the poor and needy upon those of their relatives able to pay"]; *County of Santa Clara* v. *Support, Inc.* (1979) 89 Cal.App.3d 687, 696 [152 Cal.Rptr. 754] [explaining that the purpose of Welfare and Institutions Code section 11477 is "to protect the local, state and federal share of aid granted to recipients"]; *County of Santa Barbara* v. *Flanders* (1976) 63 Cal.App.3d 486, 492 [133 Cal.Rptr. 798] [in order to recover delinquent support, or reimbursement of aid furnished, the county may sue the obligor either on behalf of the obligee, or in its own name].)

Two decisions rendered by the Courts of Appeal have held that the statutory right of the county, as assignee, to reimbursement for AFDC benefits is not affected by the actions of the custodial parent.

In *In re Marriage of Shore, supra*, 71 Cal.App.3d 290, the custodial parent received AFDC payments for a period of several years. The county undertook efforts against the noncustodial parent to secure reimbursement

for the public assistance it had paid, but was only partly successful. At the time the AFDC payments to the custodial parent ceased, the noncustodial parent owed arrearages. After the custodial parent subsequently assigned to a private collection agency her right to past child and spousal support, the agency obtained a writ of execution on certain property that belonged to the noncustodial parent. When the noncustodial parent sought to quash the writ, the county joined as amicus curiae, contending that the support arrearages were payable only to it, because these amounts had accrued while the custodial parent was receiving AFDC benefits. Observing that equitable assignment "is a creature of equity and applies to all cases where one party involuntarily pays a debt for which another is primarily liable and which in equity and good conscience should have been paid by the latter" (*id.* at p. 297), the court agreed with the county's contention and held that, by paying AFDC benefits to the custodial parent, the county obtained an irrevocable vested right to the collection of all support payments that had accrued while the custodial parent was receiving AFDC. (*Id.* at pp. 294-295.) The court added: "It is, of course, well recognized that once a valid assignment has been made, the assignor cannot cancel or modify the completed assignment by unilateral action without the assent of the assignee, nor may he defeat or impair the rights of the assignee in any other way [citations]." (*Id.* at p. 296.)

In *In re Marriage of Lugo* (1985) 170 Cal.App.3d 427 [217 Cal.Rptr. 74], the noncustodial parent contended that the county's failure to move to set aside an invalid order that had excused him from making support payments estopped the county from enforcement of his support obligation five years later. In rejecting this contention, on the ground that the elements of equitable estoppel were not shown on the record, the court in *Lugo* held: " '[E]stoppel requires some affirmative representation or acts by the public agency or its representatives inducing reliance by the claimant.' [Citations.] Our independent search of the record discloses no such affirmative act or representation on the part of the [c]ounty . . . . [¶] But quite apart from the foregoing consideration, we are persuaded that neither the doctrine of equitable estoppel nor that of laches has any application to this case. It is well established that an estoppel will not be raised against a county when to do so would nullify ' "a strong rule of policy, adopted for the benefit of the public, . . ." ' [Citations.] [¶] Where the mother is receiving AFDC benefits, 'the enforcement of child support rights involves not only a matter of private or local concern, but poses an important question for the federal and state governments as well.' [Citation.] . . . There is thus a strong and manifest policy, obviously adopted for the benefit of the public, to the effect that a county which provides public assistance to a mother and children shall have the right to reimbursement from the primary obligor, the father." (*Id.* at pp. 435-436; see also *In re Marriage of Mena, supra,* 212 Cal.App.3d 12, 20-21 [following *Lugo*].)

*Shore, supra,* 71 Cal.App.3d 290, and *Lugo, supra,* 170 Cal.App.3d 427, thus refute the contention, made by father in the present case, that improper conduct by the custodial parent operates to prevent the county, as provider of public assistance payments, from obtaining reimbursement for those payments made. *Shore* instead teaches that after a custodial parent has executed an assignment of rights in order to obtain AFDC payments, that parent's subsequent conduct (in purporting to assign rights to another party) may not be used to deny the county the right to obtain reimbursement of AFDC payments from the noncustodial parent. *Lugo* is supportive of the Attorney General's contention that the county that furnishes AFDC benefits has a statutory right to obtain reimbursement from the primary obligor for benefits already provided, as well as for ongoing support. *Lugo* also follows the well-established rule that, unless a county has done an affirmative act or made an affirmative representation that induces reliance, no estoppel will be found. (See also *Lentz* v. *McMahon* (1989) 49 Cal.3d 393, 398-402 [261 Cal.Rptr. 310, 777 P.2d 83]; *City of Long Beach* v. *Mansell* (1970) 3 Cal.3d 462, 488-489 [91 Cal.Rptr. 23, 476 P.2d 423]; *Tammen* v. *County of San Diego* (1967) 66 Cal.2d 468, 480-481 [58 Cal.Rptr. 249, 426 P.2d 753] [same].) In the present case, nothing contained in the record indicates the presence of any affirmative act or representation by Gila County, Arizona, that might have induced reliance by father and therefore excused him from his obligation to reimburse that county for child support payments made to mother.

In dicta, two other Courts of Appeal similarly have rejected contentions made by noncustodial parents that counties were estopped from collecting child support arrearages. In *In re Marriage of Kelley, supra,* 186 Cal.App.3d 613, 620-621, the appellate court rejected the noncustodial parent's contention that the custodial parent's assignment of arrearages to the county merely transferred the latter's interest subject to the same defenses that the noncustodial parent, as obligor, had against the custodial parent, as assignor. The court observed that "estoppel will not be applied to a public entity if to do so would effectively nullify a strong rule of policy adopted for the public benefit," i.e., the protection of the public fisc. (*Id.* at p. 620.) Similarly, in *State of Washington* ex rel. *Burton* v. *Leyser* (1987) 196 Cal.App.3d 451, 457 [241 Cal.Rptr. 812], another Court of Appeal rejected the custodial parent's contention that she was entitled to recover child support arrearages that had accrued during the period of concealment. The court opined that ". . . different considerations would be present if a public agency had provided support for the benefit of the children and was seeking reimbursement. A public agency cannot be estopped because of the conduct of the parents." (*Ibid.*)

In the present case, the Court of Appeal declined to follow the foregoing judicial authority and instead relied upon *In re Marriage of Smith, supra,* 209

Cal.App.3d 196. In *Smith,* the custodial parent concealed the children for more than three years, then began to receive public assistance payments for support of her children, and assigned to the paying county her rights to accrued and court-ordered child support payments from her husband. The question presented was whether the noncustodial parent could assert against the county the defense that the custodial parent's concealment estopped her from collecting child support from the noncustodial parent prior to the assignment. In answering this question affirmatively, the court in *Smith* declined to follow the judicial authority cited above, instead holding: " '. . . in determining child support rights, including those relating to the assignment of such rights, we are governed not only by the rules of common law, but also by specific statutes enacted by the federal and state legislative bodies.' [Citation.] The county has been assigned rights originally held by a private person, and by virtue of that assignment succeeded to those rights subject to any defenses then available against the assignor. (Civ. Code, § 248 ['The right of the county to reimbursement shall be subject to any limitation otherwise imposed by the law of this state.']; *County of Santa Barbara* v. *David R.* (1988) 200 Cal.App.3d 98, 102 [245 Cal.Rptr. 836] ['Under . . . section 248, the county steps into the shoes of the obligee . . . .'].) 'As a general rule, the assignee of a chose in action stands in the shoes of his assignor, taking his rights and remedies subject to any right to offset or other defenses existing against the assignor prior to actual notice of the assignment.' (*Salaman* v. *Bolt* (1977) 74 Cal.App.3d 907, 919 [141 Cal.Rptr. 841].) ' "It would be most unfair that a third person, merely by reason of his interposition, *whether he was a sovereign or not,* should be able to change the rights *inter sese* between the obligor of the chose in action and his obligee, who is the objective of the levy or attachment." ' [Citations.] In short, assignment of a sow's ear to the county cannot transform it into a silk purse." (209 Cal.App.3d at pp. 203-204, original italics.)

The Court of Appeal in the present case also challenged the assumption that reimbursement of a government entity for payment of an obligation for which it is not primarily liable is the only relevant public policy consideration. The court observed that other considerations also merit attention, among them California's declared public policy "to assure minor children frequent and continuing contact with both parents after the parents have separated or dissolved their marriage, and to encourage parents to share the rights and responsibilities of child rearing . . . ." (Fam. Code, § 3020.) The court noted that a state plan for AFDC must meet minimum mandatory requirements. (42 U.S.C. § 602.) Accompanying federal regulations mandate that the state plan provide, as a condition of eligibility for assistance, that each applicant or recipient of AFDC be required to cooperate with the state in identifying and locating the parent of a child for whom aid is claimed and

in obtaining support payments from him or her. (45 C.F.R. § 232.12 (1996).) Failure by the custodial parent to cooperate in locating the parent of a child for whom aid is claimed may result in the denial of financial assistance. The relevant statutory schemes in California and Arizona each include this federal mandate to cooperate. (See Welf. & Inst. Code, § 11477; Ariz. Rev. Stat. Ann. § 46-292(B) (1996).)

The Court of Appeal further reasoned that the State of Arizona provided public assistance to mother for several years. In that court's view, such funds were paid because Arizona either relied upon mother's "false" assertions that she did not know father's whereabouts, or because the state failed to search for him, and public policy was not served under either rationale. According to the Court of Appeal, had Arizona followed federal mandates more closely, and made "a few simple efforts," father would have been located and would have made child support payments sooner, thereby lessening the taxpayers' advances and facilitating father's visitation with his children. If mother refused to cooperate in the effort to locate father, the state could have refused payment, again lessening the money that would be advanced by the state. Thus, in that court's view, *Arizona's* inactions *caused* the continued advancement of public funds for which it now seeks reimbursement.

The Court of Appeal's analysis fails to withstand scrutiny. We have concluded that where a custodial parent's concealment of himself or herself and the child terminates when the child still is a minor, such concealment does not operate to excuse the noncustodial parent from the obligation to pay child support arrearages that accrued during the period of concealment. It follows that the noncustodial parent is *without* an estoppel defense applicable against the custodial parent. Accordingly, even if, as the Court of Appeal held, Gila County, Arizona, as assignee, were subject to the same defenses as the mother, it follows from our earlier conclusion that in this case the father lacks an estoppel defense against the county's claim.

Furthermore, although the Court of Appeal relied in part upon the obligation of Gila County, under federal regulations, to obtain mother's cooperation in locating father as a condition of the payment of public assistance, the Court of Appeal cited no authority establishing that *father* may be released from his obligation to reimburse the county for public assistance payments made to his children on his behalf, based upon *mother's* failure to cooperate or upon the *county's* failure to act with diligence in attempting to locate him. The appellate court's analysis also is deficient in failing to consider the statutory presumption that the State of Arizona properly performed its official duty in acting upon mother's welfare application and in seeking to

locate father. (Evid. Code, § 664.) Further, the Court of Appeal's suggestion that Arizona's inaction in failing to locate father contributed significantly to the amount of AFDC paid, and to the accrued child support arrearages, was based upon speculation, because the record on appeal does not reveal what efforts, if any, Arizona made to locate father. In the absence of any evidence contained in the record on appeal suggesting Arizona was derelict in its duty, we decline to hold that the presumption of official duty regularly performed was rebutted.[10]

Nor are we persuaded by the Court of Appeal's speculative assertion (echoed by father in his briefing here) that had *Arizona* been more diligent in its efforts to locate father, *he* would have commenced paying child support sooner, thereby decreasing the amount of taxpayer dollars advanced. ■ Such reasoning overlooks the circumstance that father's support obligations to his children existed irrespective of the success or failure of any governmental entity's efforts to inform him that his former spouse was receiving AFDC benefits. (See Fam. Code, §§ 3556, 3900, 4053; *County of Orange* v. *Dabbs, supra,* 29 Cal.App.4th 999, 1005.) As aptly observed by one appellate court: "By reason of his having fathered the two children, [the noncustodial parent] knew or should have known that someone or some entity was supporting his children and that a claim for recoupment could be made. A parent should not have to be advised of a moral and legal duty of support by any branch of government. . . . The natural affinity between parent and child should result in a parent's willingness to reimburse third persons or governmental entities who have supported his or her child in time of need. [Citation.]" *(In re Marriage of Hyon & Kirschner* (1991) 231 Cal.App.3d 449, 455 [282 Cal.Rptr. 408].)

■ A noncustodial parent who is unable to locate the custodial parent and the couple's child (or children) is not without recourse. As we recognized in *Damico, supra,* the noncustodial parent in such difficult circumstances "may, for example, make use of the services of the district attorney and the California Parent Locator Service in an attempt to locate the missing parent. (See Welf. & Inst. Code, § 11478.5; *[State of Washington* ex rel. *Burton* v.] *Leyser, supra,* 196 Cal.App.3d at p. 459.)" (7 Cal.4th at p. 684; see also *Damico, supra,* 7 Cal.4th 691-692, 699 (dis. opn. of Baxter, J.), citing *State* ex rel. *Arvayo* v. *Guererro* (1974) 21 Ariz.App. 173 [517 P.2d 526] [under Arizona law (as in California), the duty of support is not

---

[10]The Attorney General requests that we take judicial notice of documents derived from the Orange County District Attorney's Family Support Division files in this case. Having reviewed these documents, we conclude that they are irrelevant to our decision, and we therefore decline to rely upon them. (See *Mangini* v. *R.J. Reynolds Tobacco Co.* (1994) 7 Cal.4th 1057, 1063 [31 Cal.Rptr.2d 358, 875 P.2d 73].)

affected by interference with custody and visitation rights].) Child support payments may be made to the district attorney in the county that rendered the support order, or may be placed in a trust account for the children. (See, e.g., Welf. & Inst. Code, § 11476 [prescribing that the district attorney shall enforce support obligations of the noncustodial parent]; see also Welf. & Inst. Code, § 11475.3, eff. January 1, 1994 ["A district attorney who is collecting child support payments on behalf of a child and who is unable to deliver the payments to the obligee because the district attorney is unable to locate the obligee shall make all reasonable efforts to locate the obligee for a period of six months. If the district attorney is unable to locate the obligee within the six-month period, he or she shall return the undeliverable payments to the obligor, with written notice advising the obligor that (a) the return of the funds does not relieve the obligor of the support order, and (b) the obligor should consider placing the funds aside for purposes of child support in case the obligee appears and seeks collection of the undistributed amounts. . . ."].) In the present case, father did not utilize such alternatives. Although father did not know mother's location, he periodically was in telephonic contact with her and presumably could have made arrangements with mother to deposit child support payments into a trust account accessible to her or to intermediaries, such as mother's parents, with whom father also kept in contact. Father's failure to regularly make *any* of the court-ordered $700 monthly support payments *after* he learned in 1992 of mother's address further weakens the Court of Appeal's view that public assistance payments could have been avoided, had father only known of the assignment.

■ The Court of Appeal's analysis also is flawed by its scant deference to the important public policy favoring protection of the public fisc. That policy clearly is reflected in the applicable California statutes (see, e.g., Fam. Code, §§ 4002, 4821; Welf. & Inst. Code, § 11350 ) and in the language of the federal statute that requires AFDC grants to a state to be conditioned upon the state's obtaining from the welfare applicant or recipient an assignment of any rights to support. (42 U.S.C. § 602(a)(26)(A).) When a public agency is asked to provide financial assistance by a custodial parent who is not receiving court-ordered child support from the noncustodial parent, public policy strongly favors that agency's entitlement to seek reimbursement for funds released to the family. (*Crider* v. *Superior Court*, *supra*, 15 Cal.App.4th 227, 231-232 ["funds reimbursed under [Welfare and Institutions Code] section 11350 are not used to support the noncustodial parent's children, but rather to alleviate the burden on taxpayers and ensure that, as the numbers of needy children rise, benefits to them will not be reduced"]; *City and County of San Francisco* v. *Thompson*, *supra*, 172 Cal.App.3d 652, 657-659 [same]; *In re Marriage of Lugo*, *supra*, 170

Cal.App.3d 427, 436 [discussing the "strong and manifest policy" favoring reimbursement to the county by the primary obligor].) Such reimbursement helps ensure that public funds will be available for distribution to other families with similar needs. Thus, although father's contention that an order for welfare reimbursement "is no benefit to the *Comer* children" may be accurate in a technical sense, we decline to view the issue so narrowly, because reimbursement is intended to assist *other* families in need, just as prior orders in other cases undoubtedly helped ensure that Gila County had sufficient funds to provide public assistance to father's children. Were we to adopt the Court of Appeal's analysis and hold that the actions of either or both parents could defeat the right of the public agency to recover public funds provided to the custodial parent for the support of the children, the foregoing policy would be frustrated.

■ The Court of Appeal's reasoning that an estoppel against the county *promotes family unification*, or at least visitation and payment of child support, and therefore is consistent with the public policy that favors assuring minor children "frequent and continuing contact with both parents" following the dissolution of the parents' marriage (Fam. Code, § 3020; see also Fam. Code, § 3900) is, at best, attenuated. Indeed, if the county were estopped from collecting child support arrearages in such circumstances, family unification readily could be frustrated and welfare fraud encouraged, because estranged parents would have a powerful financial incentive *to remain apart and in hiding* from each other in a deceitful *pas de deux* performed for the purpose of duping the public agencies charged with distributing AFDC payments and collecting reimbursements. Because the noncustodial parent could be relieved of some or all of a sizable debt to the county if the custodial parent fails to rebut the concealment defense, the approach favored by the Court of Appeal either would foster unnecessary litigation regarding acts of concealment, or encourage collusion between parents designed to deprive the county of the reimbursement to which it is entitled. Under either scenario, the noncustodial parent may be strongly motivated to "pay off" the custodial parent with a portion of the conserved funds. The financial position of both parents would be improved in that event at the expense of the taxpayers.

■ Father contends that, because mother's assignment of child support rights to Gila County, Arizona addressed his support obligation, he was an "indispensable party" (see Code Civ. Proc., § 389, subd. (a)(2)(i)) entitled to receive notice of the assignment. Father further contends that the failure of mother or Gila County to provide such notice was prejudicial and denied him due process of law.

These contentions are without merit. Pursuant to the full faith and credit clause (U.S. Const., art. IV, § 1), ". . . California courts must recognize and

enforce foreign alimony and support decrees . . . ." (*Worthley* v. *Worthley* (1955) 44 Cal.2d 465, 472 [283 P.2d 19]; see also Welf. & Inst. Code, § 11477, subd. (a) ["Receipt of public assistance under this chapter shall operate as an assignment by operation of law."].) Father's duty to provide reimbursement is based upon his statutory duty to support, which is independent of his court-ordered support obligation. (See Fam. Code, § 3900; *Crider* v. *Superior Court, supra,* 15 Cal.App.4th 227, 231-232; *In re Marriage of Hyon & Kirschner, supra,* 231 Cal.App.3d 449, 455; *County of El Dorado* v. *Spence* (1986) 182 Cal.App.3d 698, 705 [227 Cal.Rptr. 365]; *County of Ventura* v. *George* (1983) 149 Cal.App.3d 1012 [197 Cal.Rptr. 245].) Thus, mother's execution of the assignment in favor of Gila County, which merely changed the identity of father's obligee, did not relieve father of his statutory responsibilities to provide financial support to his children and to reimburse the government agency that had provided such assistance on his behalf. The circumstance that AFDC frequently is requested and provided precisely *because* the noncustodial parent *cannot* be located, leads us to conclude that a notice requirement for a support assignment is unrealistic; moreover, if absence of notice could be relied upon as a basis for denying aid to a child or for relieving a noncustodial parent of reimbursement obligations designed to ensure the availability of public assistance funds generally, such a requirement clearly would be inconsistent with the strong public policy that supports a court's consideration of the child's best interest.

We decline to interpret the governing statutes in a manner that at once may invite noncustodial parents to ignore their legal and financial obligations to their children while encouraging custodial parents to deceive government agencies in order to obtain public assistance. We therefore conclude that when the custodial parent's concealment of the whereabouts of both the parent and the child is asserted by the noncustodial parent as a justification for ignoring the latter's obligation to pay child support arrearages to the custodial parent, the noncustodial parent may not assert such a defense against a county or other governmental agency that has been assigned the right to receive support arrearages for AFDC reimbursement or other public assistance payments. To the extent that *In re Marriage of Smith, supra,* 209 Cal.App.3d 196, and the other intermediate appellate court decisions cited in footnote 4, *ante,* conflict with our analysis, that authority is disapproved.

As we recognized in *Moffat* v. *Moffat, supra,* 27 Cal.3d 645, 651, one readily may sympathize with the plight of a noncustodial parent who is deprived of the right to visitation with his or her child under circumstances —such as those presented here, involving concealment that ended while the

children still were minors—that do not subject the custodial parent to the defense of estoppel to a claim for child support arrearages. The noncustodial parent in that situation certainly is deprived of the opportunity to maintain a meaningful relationship with the child. But, as noted above, the noncustodial parent's appropriate recourse lies with the remedies provided by the legal system—and not in extra-legal "self-help" alternatives or, as was the case here, in having the children bear the burden of that parent's failure to fulfill court-ordered child support responsibilities.

We conclude, therefore, that the Court of Appeal erred in holding that mother's concealment of herself and her children, terminating before either child reached the age of majority, eliminated the children's right to receive child support arrearages and estopped assignee Gila County from seeking AFDC reimbursement. The analysis engaged in by the intermediate appellate court accorded inadequate consideration to the legal rights and best interests of the children.

### III.

Upon remand, the trial court is directed to order the payment of child support arrearages in a manner that is supported by the evidence presented, crediting child support payments made by the father against the amount of arrearages owed, and is further directed to establish a repayment plan that encompasses Gila County's right to reimbursement for the public assistance payments it has made.

Accordingly, the judgment of the Court of Appeal is reversed with directions to remand the matter to the superior court for further proceedings consistent with the conclusions reached in this opinion.

Kennard, J., Werdegar, J., and Chin, J., concurred.

**MOSK, J.**—I concur in the judgment.

I write separately to express my view that there is no inconsistency between the result here and that in *In re Marriage of Damico* (1994) 7 Cal.4th 673 [29 Cal.Rptr.2d 787, 872 P.2d 787] (hereafter *Damico*).

Here, as in *Damico*, the following scenario presents itself: A court orders the noncustodial parent to pay money to the custodial parent periodically for the support of their child. In so doing, it effectively creates a kind of "trust" out of the noncustodial parent's monetary obligation, appoints the custodial parent as a kind of "trustee," and names the child as a kind of "beneficiary."

Subsequently, the custodial parent prevents payment, or refuses receipt, of the child support. Later still, returning to court, she demands arrearages. The noncustodial parent attempts to raise the defense of estoppel.

Under the law of California, when the child has not attained majority, the defense of estoppel is not available to the noncustodial parent against the custodial parent's demand for arrearages. As "trustee," the custodial parent may not lawfully prevent payment or refuse receipt of child support from the noncustodial parent against the interests of the child as "beneficiary." To allow the noncustodial parent to assert estoppel would unduly complicate matters. For he would nonetheless remain liable to the child himself.

By contrast, when the child *has* attained majority, the defense of estoppel *is* available. In that case, the "trust" may be deemed terminated by operation of law because its purpose—*child* support—has ceased to exist.

In *Damico*, inasmuch as the child to be supported had attained majority, we held that the noncustodial parent could indeed raise a defense of estoppel.

Here, inasmuch as the children to be supported had not, we hold to the contrary.[1]

**BAXTER, J.**—I concur in the judgment. I do not join in the reasoning of the majority who reach their result by distinguishing this case from *In re Marriage of Damico* (1994) 7 Cal.4th 673 [29 Cal.Rptr.2d 787, 872 P.2d 787] (*Damico*).

I concur in the judgment because it correctly holds that the child support order that is the focus of this case must be enforced. I continue to believe, however, that the concealment defense should never be recognized in an action brought under the Uniform Reciprocal Enforcement of Support Act (URESA) regardless of whether the custodial parent received public assistance for which a public agency seeks reimbursement. *Damico* should be

---

[1]Because of the result reached, there is no need to reconsider *Damico*. The lone dissenter there essentially rehearses his arguments here. Under the principle of stare decisis, his points should not even be entertained. On the merits, they must be rejected out of hand—they fail to persuade now even as they failed to persuade then.

Also, because of the result reached, there is no need to consider whether, under the Full Faith and Credit for Child Support Orders Act, codified as section 1738B of title 28 of the United States Code, the noncustodial parent could raise a defense of estoppel. It should be noted, however, that, in a proceeding in a "forum" state such as California to enforce a child support order of an "issuing" state, the act does *not* preclude the forum state from applying its own law. Quite the contrary. As a general matter, the act *requires* the forum state to do so: Generally, "[i]n a proceeding to . . . enforce a child support order, the forum State's law *shall* apply . . . ." (28 U.S.C. § 1738B(g)(1), italics added.)

overruled. *Damico* was wrong at the time it was decided and the amorphous "active concealment" defense it created has since been superseded by federal legislation which mandates that a sister-state child support order be given full faith and credit and enforced according to its terms. Under the supremacy clause, that federal law is controlling.

The majority hold that a URESA action to compel a noncustodial parent to comply with a child support order by paying current support and arrearages may proceed notwithstanding the noncustodial parent's claim that the custodial parent concealed the child if the concealment ends while the child is still a minor. I concur in this holding because the court reaches the result here that it should have reached in *Damico* regardless of whether there was concealment.

The result in this case is proper because it carries out this state's constitutional and statutory obligations governing the enforcement of judgments. Those obligations may not be avoided on the ground that enforcement of the Arizona judgment would be inconsistent with the policy of this state. (*Williams* v. *North Carolina* (1942) 317 U.S. 287, 293 [87 L.Ed. 279, 283, 63 S.Ct. 207, 143 A.L.R. 1273]; *In re Marriage of Moore & Ferrie* (1993) 14 Cal.App.4th 1472, 1479 [18 Cal.Rptr.2d 543]; see Hogoboom & King, Cal. Practice Guide: Family Law 3 (The Rutter Group 1995) ¶ 18:901, p. 18-144.)

Equally important, the concealment defense to which the majority give continued life, however short that life now may be, is itself contrary to the public policy of this state which seeks to ensure that minor children will have "frequent and continuing contact with both parents." (Fam. Code, § 3020.)[1] Instead of encouraging noncustodial parents to act at the earliest possible time to assert their custody and visitation rights, and thereby to maintain parental ties with their children, the concealment defense rewards the parent who acquiesces in a custodial parent's violation of court ordered visitation and custody and abandons both the parental role and the obligation of support.

The majority attempt to explain the failure to reconsider *Damico* on the basis of the parties' failure to seek such reconsideration. There are cases in which such an explanation is understandable. This is not such a case, as the

---

[1] All statutory references are to the Family Code unless otherwise noted.

Section 3020: "The Legislature finds and declares that it is the public policy of this state to assure minor children frequent and continuing contact with both parents after the parents have separated or dissolved their marriage, and to encourage parents to share the rights and responsibilities of child rearing in order to effect this policy, except where the contact would not be in the best interest of the child, . . ."

majority's attempt to reconcile the result it proposes with *Damico* demonstrates. By permitting an action for arrearages whenever the custodial parent's concealment of the child terminates while the child is still a minor, the majority permits recovery in circumstances barred by *Damico*. In so doing the majority explain that a Court of Appeal which faithfully followed the holding and logic of *Damico* somehow went astray.

As the majority acknowledge, *Damico* justified its holding, barring collection of arrearages, on the ground that, when concealment continues until a child has reached majority the purpose of support payments for the benefit of the child has been defeated. The majority do not acknowledge that under this opinion there is no bar to collection of arrearages after a child reaches majority other than the 10-year statute of limitations, which permits suits long after the child reaches majority. Even suits filed before a child reaches majority need not result in payment of arrearages until many years after the child reaches majority. There is no more assurance that the suits the court authorizes today will result in payment of arrearages that will benefit the child rather than the parent, than there was in *Damico*. Indeed, since a substantial portion, and possibly all, of the recovery in this case is owed to the State of Arizona,[2] that portion cannot benefit the child. In many cases brought by public agencies seeking reimbursement of public assistance, none of the recovery will benefit the child. And, of course, *Damico* penalizes the custodial parent who incurred indebtedness while the child was a minor to provide the benefits the child support payments would have provided.

Moreover, the discussion by the majority of the right of a public agency to seek reimbursement is dicta. No public agency is a party to this proceeding in which the action is brought by and on behalf of the custodial parent and the only relief sought is the payment of arrearages owed to her under an Arizona judgment. Ignoring the procedural posture of the case the majority order payment to Gila County, which, even though it may have been the conduit for payment of public assistance to the custodial parent, has no rights under the assignment of rights executed by the parent.

In short, the effort to avoid overruling bad law creates more bad law, all because the parties did not seek reconsideration of *Damico*, and despite the

---

[2]Under the assignment executed by this petitioner, any rights she had to child support, *including all past due support* and all current and future support until six months after she stops receiving Aid to Families with Dependent Children (AFDC) now belong to the Arizona Department of Economic Security. Her right to personally enforce payment of child support is limited to arrearages accumulated subsequent to the assignment *and* more than six months after she stops receiving AFDC. Therefore, the $29,300 in arrearages accumulated before she began receiving AFDC which petitioner seeks in this action has been assigned to the Department of Economic Security. Only when the Department of Economic Security has been fully reimbursed for the AFDC paid to petitioner will the assignment for arrearages be terminated. Nothing in this record indicates that petitioner is personally entitled to any arrearages at this time.

majority's awareness of the substantive and procedural barriers that make the holding untenable.

*Damico* itself can be explained only as a judicial effort to punish custodial parents who deny noncustodial parents access to their children. I find a custodial parent's deliberate concealment of a child for the purpose of frustrating the visitation and custody rights of the noncustodial parent as abhorrent as did the *Damico* majority. I part company with the majority here when it implicitly reaffirms the *Damico* view that the court may express this opinion by refusing to enforce a child support judgment of a sister state against the noncustodial parent.

Moreover, the implicit reaffirmation of *Damico* proceeds notwithstanding the intervening enactment of the Full Faith and Credit for Child Support Orders Act, 28 United States Code section 1738B (section 1738B or FFCCSOA). Leaving the impact of that statute, which offers a potential basis for abandoning *Damico* gracefully, for decision in a future case, the majority postpones the inevitable while creating continued uncertainty and turmoil in lower courts that are called upon to enforce payment of child support arrearages under URESA. (Fam. Code, § 4800 et seq.)

As I indicated in my dissenting opinion in *Damico*, I would not recognize any estoppel to enforce payment of arrearages or current support owed under a court order or judgment on the basis of concealment.[3] Doing so is contrary to the legislative intent underlying California's adoption of URESA and to that of Congress when, in conjunction with the introduction and passage of FFCCSOA, it addressed the problems custodial parents and states which must assist them in enforcing support orders face if the noncustodial parent moves to a different state.

In 1993, the chairman of the House Judiciary Committee termed the record of interstate child support enforcement "tragic." Only $1 out of every $10 owed to custodial parents was being collected. (15 Nat'l L.J. (Aug. 16, 1993) p. 17, col. 3.) Congress responded to what was then perceived as a national crisis in child support collection, which left millions of single parent households in poverty, and to the inability or unwillingness of state agencies

---

[3] As one commentator has noted, "if the court's point in *Damico* is to establish that estoppel to collect applies only when legal recourse for the concealment is impossible, the district attorney's entrance into the case (i.e., payment of public assistance to the custodial parent) makes concealment impossible. Thus the district attorney becomes the person against whom the noncustodial parent could seek redress by way of court orders directing disclosure of the child's whereabouts; or an order changing custody so that concealment becomes kidnapping; or, at the least, an order terminating the duty to pay child support." (Lurvey, *What Goes Around Comes Around—Even in Family Law* (Winter 1995) 17 Fam. Advoc.1, 6.)

to enforce support obligations with proposals which, if adopted, would "federalize" child support enforcement. Congress's initial move toward increased federal involvement was the introduction of FFCCSOA in 1993. (16 Nat'l L.J. (Sept. 13, 1993) p. 1, col. 1.) The purpose of FFCCSOA was to create uniformity among states in enforcing child support orders (*Isabel M. v. Thomas M.* (1995) 164 Misc.2d 420 [624 N.Y.S.2d 356, 358], and to put an end to a situation which "encourage[d] non-custodial parents to relocate outside the States where their children and custodial parents reside in order to avoid the jurisdiction of such State." (Sen.Rep. No. 361, 103d Cong., 2d Sess. (1994), reprinted in 1994 U.S. Code Cong. & Admin. News, p. 3262.)

The congressional findings that were made part of section 1738B recite that FFCCSOA was deemed necessary because attempts to enforce child support orders in multiple jurisdictions with varying law allowed parents to avoid payment of support for extensive time periods, led to excessive relitigation of cases, conflicting orders, confusion, waste of judicial resources, and diminished public confidence in the rule of law. (Sen.Rep. No. 361, 103d Cong., 2d Sess., *supra*, 1994 U.S. Code Cong. Admin. News, *supra*, p. 3262; see *Paton v. Brill* (1995) 104 Ohio App.3d 826 [663 N.E.2d 421, 424].)

In stark contrast to these federal efforts, the response of this court to the crisis in enforcement of child support obligations was *Damico*. *Damico* not only encourages noncustodial parents to abandon their children rather than take even minimal efforts to enforce their visitation and custody rights through the court or local district attorney, but invites them to relocate to California where any attempt to collect court ordered support may be opposed with a claim that the custodial parent "actively concealed" the child or children. *Damico* is part of the problem Congress sought to resolve in FFCCSOA.

*Damico* also ignored the purpose of URESA and effectively dismantled the California version of the interstate enforcement mechanism by creating that ill-defined "active concealment" defense to interstate child support collection actions. *Damico* rewarded scofflaws with a unique "equitable estoppel" defense to a URESA collection action and imposed burdens far beyond those contemplated by URESA on already overburdened California district attorneys. In the wake of *Damico*, a URESA collection action is no longer an efficient, streamlined procedure by which the amount of child support arrearages and current support obligations is determined and enforced. After *Damico,* a URESA action is one in which the district attorney representing the state in which a child resides must overcome a noncustodial parent's claim that the custodial parent "actively concealed" the whereabouts

of the child for whom support is owed. Before *Damico,* establishing the existence of the support order and the amount owed and obtaining a judgment for arrearages of child support was a routine matter. Today, trying a full blown lawsuit over concealment is quite another matter. Moreover, by refusing to fully enforce a sister-state support order in a URESA action, the court does indirectly what it could not do directly—it conditions the obligation to pay support on compliance with a visitation order. (See *Towne* v. *Buckingham* (Fla.Dist.Ct.App. 1993) 624 So.2d 858.)

The result ignores the best interests of the children by encouraging noncustodial parents to violate support orders and removing any incentive these parents might have to maintain a parental relationship with their children. Even minimal attempts by noncustodial parents to locate their children and exercise their visitation rights, made without recourse to available judicial remedies or administrative assistance, are rewarded by *Damico*, which relieves these parents of their support obligations. This may occur notwithstanding the policies underlying URESA and FFCCSOA. Each of those statutes reflects a legislative conclusion that the interests of the children of separated or divorced parents are best served if the parents reconcile differences over visitation and custody at the earliest possible time and that they do so through the judicial system. By expressly divorcing custody and visitation disputes from support obligations and restricting retroactive modification of unpaid support in interstate actions to enforce child support orders, Congress and the California Legislature have acted to implement their conclusion that the best interests of the children demand that a parent who believes that the custodial parent is unduly restricting access to the children seek judicial intervention at the earliest possible time in order to reinforce and maintain the parental ties. *Damico* gave no consideration to the best interests of the children, and today the majority leave on the law books a decision which holds, in effect, "see your children and pay child support, ignore them and save money."

Now, given the opportunity to correct its misguided attempt to do "equity" in *Damico*, the majority not only decline the opportunity, but fail to acknowledge federal law mandating enforcement "according to its terms" of child support orders of another state if consistent with that law. And, while giving lip service to the state's constitutional obligation to give full faith and credit to a sister-state judgment, it nonetheless reaffirms a decision which holds that a state-created equitable estoppel defense relieves the state of a federal constitutional obligation.

A refusal to enforce a sister-state child support order also appears to violate FFCCSOA, which preempts California law in a URESA enforcement proceeding and applies to all pending cases. (See *State, Dept. of Revenue* v.

*Fleet* (Fla.Dist.Ct.App. 1996) 679 So.2d 326; *Isabel M.* v. *Thomas M., supra,* 624 N.Y.S.2d 356, 360-361.) Because it became law after *Damico* was decided, FFCCSOA was not considered by this court when it concluded that an estoppel to enforce a sister-state child support order should be recognized when there is "active concealment" of the child by the custodial parent. Compliance with FFCCSOA appears to make continued adherence to *Damico* untenable and indefensible. The congressional findings and statement of purpose accompanying FFCCSOA are particularly relevant. Section 1738B was accompanied by these findings and statements of policy and purpose (Pub.L. No. 103-383 (Oct. 22, 1994) § 2, 108 Stat. 4064):

"(a) FINDINGS.—The Congress finds that—

"(1) there is a large and growing number of child support cases annually involving disputes between parents who reside in different States;

"(2) the laws by which the courts of different jurisdictions determine their authority to establish child support orders are not uniform;

"(3) those laws, along with the limits imposed by the Federal system on the authority of each State to take certain actions outside its own boundaries—

"(A) encourage noncustodial parents to relocate outside the States where their children and the custodial parents reside to avoid the jurisdiction of the courts of such States, resulting in an increase in the amount of interstate travel and communication required to establish and collect on child support orders and a burden on custodial parents that is expensive, time consuming, and disruptive of occupations and commercial activity;

"(B) contribute to the pressing problem of relatively low levels of child support payments in interstate cases and to inequities in child support payment levels that are based solely on the noncustodial parent's choice of residence;

"(C) encourage a disregard of court orders resulting in massive arrearages nationwide;

"(D) allow noncustodial parents to avoid the payment of regularly scheduled child support payments for extensive periods of time, resulting in substantial hardship for the children for whom support is due and for their custodians; and

"(E) lead to the excessive relitigation of cases and to the establishment of conflicting orders by the courts of various jurisdictions, resulting in

confusion, waste of judicial resources, disrespect for the courts, and a diminution of public confidence in the rule of law; and

"(4) among the results of the conditions described in this subsection are—

"(A) the failure of the courts of the States to give full faith and credit to the judicial proceedings of the other States;

"(B) the deprivation of rights of liberty and property without due process of law;

"(C) burdens on commerce among the States; and

"(D) harm to the welfare of children and their parents and other custodians.

"(b) STATEMENT OF POLICY.—In view of the findings made in subsection (a), it is necessary to establish national standards under which the courts of the various states shall determine their jurisdiction to issue a child support order and the effect to be given by each State to child support orders issued by the courts of other States.

"(c) PURPOSES.—The purpose of this Act are—

"(1) to facilitate the enforcement of child support orders among the States;

"(2) to discourage continuing interstate controversies over child support in the interest of greater financial stability and secure family relationships for the child; and

"(3) to avoid jurisdictional competition and conflict among State courts in the establishment of child support orders."

To accomplish the congressional purpose section 1738B directs: "(a) *The appropriate authorities of each State*—

"*(1) shall enforce according to its terms a child support order made consistently with this section by a court of another State;* and

"*(2) shall not seek or make a modification of such an order* except in accordance with subsection (e)." (Italics added.)

Under the definitional provision of section 1738B, child support includes arrearages. (§ 1738B(b).) A child support order is consistent with the section

if the court which made it has subject matter and personal jurisdiction and gave reasonable notice and opportunity to be heard. (§ 1738B(c).)

Under section 1738B, a court of another state may modify a child support order only if it has jurisdiction to make a child support order *and* the original state no longer has continuing exclusive jurisdiction because "that State no longer is the child's State or the residence of any contestant" or the contestants have filed a written consent to the modification. (§ 1738B(e).) In all other circumstances the state must enforce the order "according to its terms."

Since section 1738B clearly applies to the order in dispute here, that act compels the courts of this state to enforce the Arizona child support order, including all arrearages.[4]

Therefore, recognition of a concealment defense to an action for arrearages is inconsistent with URESA and section 1738B. Finally, it is also inconsistent with the Uniform Interstate Family Support Act (UIFSA) which the National Conference of Commissioners on Uniform State Laws adopted in 1992 with the intent that it ultimately replace URESA. UIFSA expressly provides that a state responding to an interstate request for enforcement of a support order may not condition payment of a support order on compliance with visitation provisions. (9 West's U.Laws Ann. (1996 pocket supp.) UIFSA, § 305(d).) The comment to this subdivision reflects recognition that litigation of visitation issues would preclude efficient and speedy enforcement. "Under Subsection (d), an interstate support order may not be conditioned on compliance with a visitation order. While this may be at variance from state law governing intrastate cases, under a UIFSA action the petitioner generally is not present in the tribunal. This distinction justifies prohibiting visitation issues from being litigated in the context of a support proceeding." (*Id.,* com. at p. 284.) When the purpose of this limitation is considered, the distinction made by *Damico* between interference with visitation and concealment of the child becomes meaningless. Whether the parent seeking to enforce a support order has simply interfered with visitation or has allegedly concealed the child must be litigated even though the petitioner is not present in California. It is this litigation which precludes

---

[4] I would reject respondent's argument that section 1738B(g), permits a state to recognize an estoppel to enforce a child support judgment as a construction that is clearly inconsistent with the express congressional intent underlying FFCCSOA. Section 1738B(g) permits a state to apply its own procedures and remedies, not to create substantive defenses to enforcement which preclude any collection. (Saxon, *The Federal "Full Faith and Credit for Child Support Orders Act"* (1995) 5 Inst. of Gov.Fam.L.Bull. 1, 4.) It is inconceivable that Congress, which directed that a foreign child support judgment be enforced "according to its terms" and prohibited any modification, intended to permit a state to create equitable defenses that make enforcement impossible.

efficient enforcement of support orders by making it necessary for the district attorney to marshal evidence to meet the concealment defense, for the custodial parent to travel to the responding state to offer testimony relevant to the concealment claim, and, under the proposed "unmet needs" limitation on recovery, for the custodial parent to establish which needs of the child remain unmet.

UIFSA, which is to be followed in any state which adopts it regardless of reciprocity, also placed strict limits on the extent to which a responding state may recognize defenses to enforcement when a support judgment or order is registered in the state of the noncustodial parent's residence for purposes of enforcement. Section 607 permits a party contesting either validity or enforcement of a child support order registered in the responding state to contest *only* on grounds that the issuing court lacked personal jurisdiction; the order was procured by fraud; the issuing state has suspended, vacated or modified the order; the order has been stayed pending appeal; the responding state law provides a defense to the remedy sought; payment has been made, or the statute of limitation precludes enforcement of some or all of the arrearages. (9 West's U.Laws Ann., *supra*, UIFSA, § 607.)

The commissioners' comment to this section is also instructive: "Proof of arrearages *must* result in enforcement; under the Bradley Amendment, 42 U.S.C. § 666(a)(10), all states are required to treat child support payments as final judgments as they come due (or lose federal funding). Therefore, such arrearages are not subject to retroactive modification." (9 West's U.Laws Ann., *supra*, UIFSA, § 607, com. at p. 308, italics added.)

The federal law to which the commissioners refer provides federal funding for child support enforcement only to states which have in place statutory and administrative procedures that meet minimum federal standards. (See 42 U.S.C. §§ 629d, 654, 655, 658, 666.) 42 United States Code section 666 requires procedures for withholding currently owed child support and arrearages from the income of the noncustodial parent. In a February 27, 1995, Executive Order No. 12953, 95 Fed.Reg. 11013 affecting collection from federal employees and members of the armed services the President noted that federal law "requires States and, through them, public and private employers to take actions necessary to ensure that monies in payment of child support obligations are withheld and transferred to the child's caretaker in an *efficient and expeditious manner*." (*Ibid.*, reprinted in 1995 U.S. Code Cong. & Admin. News, p. B-13, italics added.)

Therefore, the burden that *Damico* placed on the district attorney and the custodial parent is not only inconsistent with, but is expressly prohibited by,

URESA, FFCCSOA, and UIFSA. In choosing to avoid deciding the relevance of FFCCSOA to the *Damico* decision, the majority also choose to overlook or ignore the impact of a refusal to enforce full payment of arrearages, interstate or otherwise, may have on federal funding of California's efforts toward full enforcement of child support obligations of noncustodial parents. Permitting an equitable estoppel to be based on recognition of a concealment defense to enforcement is nothing less than a refusal to enforce payment of all arrearages due under a support order.

*Damico* also failed to acknowledge that the custodial parent has a property interest in arrearages owed under a support order just as the parent has in any debt.[5] The effect is to preclude collection of a matured debt and thereby to destroy the obligee's property interest in the judgment. Invocation of a court's equitable power to destroy an existing property interest by refusing to enforce a claim is not consistent with due process.

The custodial parent's interest in arrearages owed under a judgment is not just statutory. A judgment is a vested property right, protected under article I, section 1 of the California Constitution as a contract. (*Jones* v. *Union Oil Co.* (1933) 218 Cal. 775, 778 [25 P.2d 5].) "[A] judgment is a form of contract protected by the contract and due process clauses of the state and federal Constitutions." (*Caminetti* v. *Pac. Mutual L. Ins. Co.* (1943) 22 Cal.2d 344, 363 [139 P.2d 908]; see also *Weaver* v. *San Francisco* (1905) 146 Cal. 728, 732 [81 P. 119]; *Wallace* v. *Eldredge* (1864) 27 Cal. 498; *Scarborough* v. *Dugan* (1858) 10 Cal. 305.) While *Caminetti* addressed constitutional limitations on the power of the Legislature to retroactively impair contract rights, the due process considerations are equally applicable to a statutorily unauthorized judicial reduction of arrearages accrued under a valid child support judgment.

---

[5]*Damico* also failed to reconcile its recognition of equitable estoppel in these circumstances with California statutory procedures for enforcement of judgments. Code of Civil Procedure section 697.320, provides, for instance, that a judgment for child support payable in installments may be recorded to create a judgment lien on real property which continues and is enforceable for 10 years if not satisfied or released. The amount of the lien is the amount necessary to satisfy the judgment. (Code Civ. Proc., § 697.350.) An obligee able to utilize this procedure may, therefore, collect the full amount of the child support judgment, while a custodial parent who seeks to enforce payment of arrearages under URESA may not do so at all if the child reached adulthood before the concealment ended. *Damico* did not attempt to justify the disparate treatment which is dependent only on the procedural mechanism under which the parent seeks to enforce the judgment for child support.

*Damico* is also inconsistent with Family Code sections 4822 and 4848-4850. Under these provisions a foreign support order may be registered in this state and thereafter is enforceable, including arrearages, in the same manner as a judgment made by a court of this state. Family Code section 5100 also provides: "[A] child or family support order may be enforced by a writ of execution without prior court approval as long as the support order remains enforceable."

A judgment for the payment of money is also a debt (see *Pacific Gas & Elec. Co.* v. *Nakano* (1939) 12 Cal.2d 711, 712-713 [87 P.2d 700, 121 A.L.R. 417] [tort claim merged in final judgment is a debt]) and as such is a property right which the state may not impair. (*Jones* v. *Union Oil Co.*, *supra*, 218 Cal. 775, 778.) When a judgment calls for installment payments as does a child support order, each installment becomes enforceable from the date the installment is due (Code Civ. Proc., former § 683.030, Fam. Code, § 5102) and is a debt if not paid. The remedy by which a judgment may be enforced is itself a vested property right. (*Logan* v. *Zimmerman Brush Co.* (1982) 455 U.S. 422 [71 L.Ed.2d 265, 102 S.Ct. 1148] [right to use statutory procedure for adjudication of state fair employment based claim is property right protected by due process]; *Jones* v. *Union Oil Co.*, *supra*, 218 Cal. 775, 778 [remedy is part of obligation of contract and subject to constitutional protection against impairment].) When the judiciary, rather than the Legislature, impairs contract and property rights inherent in a final judgment, serious federal constitutional questions arise under the due process protections of the Fourteenth Amendment and California Constitution, article I, section 7 (as opposed to the impairment of contract protection of article I, section 9).[6]

Application of equitable estoppel to avoid enforcing a judgment for child support in whole or in part cannot be distinguished from retroactively modifying the judgment. The result is the same. The label has no constitutional or statutory significance. Family Code section 3651 provides that an original order for child support may not be modified as to accrued sums. This court's holding in *Damico* that equitable estoppel may be applied to preclude enforcement of arrearages accrued under the order was nothing more than a judicial end-run around the statutory bar to modification or termination of the obligation to pay arrearages. The majority nonetheless adhere to *Damico,* and imply that in another case, even if "active concealment" ended during the minority of the child, the court might refuse to enforce payment of arrearages if it would be unjust to do so.

Although the majority decline the opportunity to reconsider *Damico* in light of FFCCSOA, it displays no similar reluctance to discuss in dicta an

[6]The Oregon Supreme Court and the Oregon Court of Appeals have rejected attempts to apply equitable estoppel principles to actions for enforcement of payment of arrearages due under child support orders for similar reasons. In *Starzinger* v. *Starzinger* (1986) 82 Or.App. 96 [727 P.2d 168, 169], the court held that retrospective modification of a judgment for support for the period between entry of judgment and the time of a motion for modification of the judgment is not permitted. The *Starzinger* court relied on *Eagen* v. *Eagen* (1982) 292 Or. 492, 496 [640 P.2d 1019, 1021] where the Oregon Supreme Court explained: "We are aware that some courts have set aside support judgments for equitable reasons, contrary to the general rule[,] . . . but those holdings do violence to principles protecting the integrity of judgments and have ramifications far beyond the law of domestic relations." (See also *Poe* v. *Poe* (1967) 246 Or. 458 [425 P.2d 767].)

issue that is not presented in this case—the right of a state agency to recover for support paid to the child when, under *Damico*, the custodial parent is estopped. The majority conclude in dicta that a state or state agency which has provided public assistance for the support of the child is not estopped to seek payment of arrearages even if concealment estops the custodial parent. Consistent with my view that a custodial parent is never estopped to enforce payment of arrearages, I agree that the state or state agency is not estopped to enforce payment of child support and arrearages under a support order when the custodial parent's rights under the order have been assigned to it.[7]

The majority state in additional dicta that under section 4002, a county may act on behalf of a child to enforce the child's right to support. That is true, but this URESA action to enforce a child support order does not involve rights arising under that section. This is an action to enforce the rights of the custodial *parent* under the child support order made in her Arizona dissolution action, including rights which the parent has assigned to the Arizona agency. Section 4002 has nothing to do with this URESA action.

For these reasons I do not join in the majority opinion. I concur in the judgment insofar as it holds that the Arizona judgment may be enforced without regard to the alleged concealment. Because the issue has not been raised or briefed, I venture no opinion on the right of this petitioner to seek enforcement of rights that she appears to have assigned to the Arizona Department of Economic Security.[8]

Brown, J., concurred.

---

[7]If, notwithstanding the fact that she apparently seeks to enforce a right she has assigned to another, and the failure to join the assignee of those rights, petitioner recovers any of the arrearages sought in her petition, she is obligated under the assignment to turn over to the Arizona Department of Economic Security any arrearages heretofore assigned that she may receive under the judgment of the trial court.

[8]Perhaps the parties and the Arizona Department of Economic Security have reached some off-the-record agreement under which petitioner is authorized to enforce rights she assigned to the department, or will do so on remand.